LOULIA B. SMITH and MARGARET SMITH, MARIAN SMITH, RUBY SMITH, FRANK SMITH, and JOHN SMITH, Minors, by their Guardian ad litem, LOULIA B. SMITH, Respondents, v. THE CENTENNIAL EUREKA MINING COMPANY, a Corporation, and THE RIO GRANDE WESTERN RAILWAY COMPANY, a Corporation, Appellant.

### No. 1473. (75 Pac. 749.)

1. **Master and Servant: Death by Wrongful Act: Contributory Negligence: Disobedience of Rules.**
   A laborer employed by a mining company, to fill freight cars with ore was required to loosen the brakes on the cars left by the railroad company at a distance from the orehouse, allow them to move downgrade to the orehouse, and stop them there by means of the brakes. While letting two cars down he lost control of them. They ran to the bottom of the grade, and he was killed. The brakes were obviously very defective. On beginning work he had been instructed never to let more than one car down at a time, to place blocks on the track to stop the car at the orehouse, and to inspect cars before attempting to move them, and report defects. *Held*, that his failure to do any of these things on the occasion in question was contributory negligence, precluding recovery for his death from the mining company.[1]

2. **Same: Contributory Negligence: Defense: Third Party.**
   Where an employee of a mining company was killed while using cars which a railroad company had negligently allowed to remain in a defective condition, but deceased was guilty of contributory negligence in failing to observe rules prescribed by the mining company, the defense of contributory negligence was available to the railroad company, though no contract relation existed between the railroad company and deceased.

   McCARTY, J., dissenting in part.

[1] Butte v. Pleasant Valley Coal Co., 14 Utah 282, 47 Pac. 77; Higgins v. Southern Pac., 26 Utah 164, 72 Pac. 690; Burgess v. R. R. Co., 17 Utah 406, 53 Pac. 1013.

(Decided February 25, 1904.)

Appeal from the Fifth District Court, Juab County.—
*Hon. Thomas Marioneaux,* Judge.

Action to recover damages for death alleged to have
been caused by the negligence of the defendants. From
a judgment in favor of the plaintiffs against the rail-
way company, it appealed.

REVERSED.

*Messrs. Sutherland, Van Cott & Allison* for appel-
lant.

*L. R. Rogers, Esq.,* and *W. R. White, Esq.,* for re-
spondents.

STATEMENT OF FACTS.

This action was brought by the heirs of John P.
Smith to recover damages for his death, which, they
claim, was caused through the negligence of the defend-
ants. The allegations of the complaint, so far as ma-
terial to this decision, are, substantially, that on May
4, 1901, and for six or more months previous to that
date, John P. Smith, the deceased, was employed by the
defendant mining company in filling ore and other ma-
terials from a mine chute and other buildings belonging
to the mining company into freight cars belonging to
the defendant railway company; that at and during
such time the deceased was so employed at Eureka,
Juab county, Utah; that the mining company had en-
gaged the railway company to haul ore from Eureka
to various places for the purpose of smelting and selling
it, and to provide strong, safe, and suitable cars there-
for, which should be safe for the use of the employees
of the mining company in loading ore on them; that
freight cars were provided for the mining company by
the railway company, and that it was the duty of both
defendants to see that the cars were in good repair and

condition for the said John P. Smith in loading them with ore for freighting; that on the date above mentioned the railway company furnished the mining company and the deceased with two cars for ore, and placed them higher up on the track than the ore chutes and building containing ore, and on a higher grade than the place where the chute is opposite to the track, thereby leaving the deceased to drive the two cars down to the chute; that on both cars the brakes, and appliances connected with them, were badly out of repair and loose, "the equalizer, pins, bolts, bars, and other appliances connected with the brakes were out of repair and loose; the shoes connected with the brakes and wheels of the cars were worn out and thin and badly out of repair, and would not hold or block the wheels of said cars, and some of the shoes of the cars were entirely gone on said day, and were negligently permitted for some time previous to remain so;" that the defective and unsafe condition of the brakes and appliances could, with the exercise of ordinary care and diligence, have been discovered by the defendants, and at the time mentioned was known to them, but the same was unknown to the deceased; that on the day mentioned, while the deceased was performing his duties of loading ore, it became necessary for him to drive said cars from the higher grade, a distance of several rods, down near and under the ore chute, and in attempting to do so lost control of the cars, by reason of the defects aforesaid, and the same went down the grade, past the ore chute and building where the ore was, at a high rate of speed, and collided with certain loaded cars below, with such force that the deceased was thrown between the cars, and there crushed and killed; and that the plaintiffs were dependent upon the deceased for support.

The railway company in its answer denies the allegations of the complaint respecting negligence, and pleads affirmatively contributory negligence of the deceased, and that his injuries and death were occasioned by the risks incident to his employment.

From the evidence it appears, in substance, that for about six months before and at the time of the fatal accident the deceased was in the employ of the defendant mining company, and his duties were to load ore from that company's orehouse, through ore chutes, into cars furnished by the railway company. The building stood alongside of a side track belonging to the railway company, extending in an easterly direction from the company's main line of railway to a point some distance beyond the orehouse. From the point where the deceased started the cars at the time of the accident to the orehouse there is a descending grade. In front of the building the track is level, but immediately after passing the building the track again has a down grade of about 4.35 feet in every 100 feet. From the point where the grade commences to descend to the lowest point in the grade before it commences to ascend the distance is about 610 feet. The railway company in furnishing cars to the mining company, ran them from its main line onto this side track, and left them standing above the orehouse. It was then the business of the mining company to run the cars, as it required them, down to the orehouse, by means of the brakes, load them with ore, and, upon being loaded, run them down below the orehouse to the lowest point on the grade, to be taken thence by the railway company onto its main line. On May 4, 1901, and for some months prior thereto, the deceased was in the employ of the mining company, and it appears this work of so loading and running down the cars was intrusted to him. On the afternoon of that day he attempted to run two cars, Nos. 631 and 678, coupled together, down the track, doubtless, as indicated by the circumstances, with the intention of stopping them at the orehouse and loading them. This he attempted to do by means of the hand brakes, but was unable to stop them, and the cars ran past the orehouse down the steep grade and collided with other cars loaded with ore. In the collision he was thrown between the cars, crushed, and killed.

The evidence introduced on behalf of the plaintiffs shows that the two cars which caused the collision were examined by a number of persons very shortly after the accident, and that the braking apparatus was badly out of repair; that on the one car the braking apparatus was so defective as to render it practically useless; that the brake shoes were worn very thin; that by manipulating the brake staff one could get no pressure on the brake wheel; that the brake chain on the staff was doubled on itself between a brace and the brake staff, so that the brake could not be set; that there was one cog broken out of the cog wheel on the brake staff; and that there was too much slack in the brake chain. As to the other car, the plaintiffs' evidence shows that the brake shoes were badly worn; that one of them was riding on the flange of the wheel, which prevented the even application of the braking power; that two guide bolts were gone; and that the point of the brake dog was so chipped and worn that it would not lock into the ratchet on the brake staff. It further appears from such evidence that, while the braking apparatus on one of these cars might possibly have held it, it was entirely inadequate, owing to the defects, to hold the two cars, and that the defects were so numerous and obvious that they could readily be discovered.

Respecting the braking apparatus, the witness B. L. Short, testifying for the plaintiffs, in the course of his testimony, inter alia, made statements as follows: "I got up on No. 678, and tried to set the brake, and found out that the shoes would make no effect upon the brake wheel. I found that the chain was doubled on itself, and was binding with the brace that came down on the staff. You might twist there as long as you wanted to and you would not get any brake power, for the reason that it was iron-bound. The brake shoes did not take hold of the wheel. You could move it with your foot. After getting down out of the car onto the ground I examined the brake chain to determine whether there was too much slack in it or not, and found

that there was; it could have been taken up. Assuming that the conditions on Saturday (day of accident) were the same as I found them on Sunday, I would say that the front car, No. 678, could not have been moved down that track by a man without its running away, because he would not have the brake power to hold the car—practically no brake power. My opinion is that if car 678 had been left standing on the side track loose, not coupled to any other car, it would not have remained stationary, for the brakes would not have held it. The car was simply held there by reason of the fact that it was coupled to the car above it (631). Coming down to the defects on car number 631, the dog which fits into the ratchet, thereby locking the brake after being set, was worn thick, and it would not lock into the ratchet. I could not get the dog to stay in the ratchet at all unless I put my foot against it. The brake chain was loose, but it did not seem to work just right. The brake shoe was out on the flange, which did not give an even pressure on both ends of the break beam. I discovered something was wrong immediately by turning the wheel. I found I could not get action on it like one in good order. I discovered at once that the dog was bad. I looked to see if it was in position, and saw that it was chipped. All I had to do to discover this was to look down at the dog. I examined the brakes on these two cars, and found that the brake shoes on 631 were defective in the extreme. If car 631 was in the same condition the day previous as when I found it, it could not have stood on the incline by means of the brakes and the dog and the ratchet. If I would have to answer the question whether or not, in my opinion, the brakes on car 631 were sufficient in the hands of an experienced brakeman to handle it down that grade, I would say they were not. My opinion is that two experienced men could not have handled and controlled those two cars by means of the brakes; two men could not have handled them going down that incline by the brakes." The witness also stated that the two cars could have been un-

coupled by the use of brake blocks; and in relation to the ascertainable character of the defects in the braking apparatus the same witness, among other things, in the course of his testimony, said: "If a man had looked for anything of that kind, he certainly would have seen it. A man who is accustomed to the business can tell very readily, when handling a brake staff, if he is getting any pressure, whether the car is in motion or standing still. A man who is accustomed to braking can tell pretty well whether a brake is in good condition by turning the handle. If there is a failure of the braking apparatus to work, and a consequent failure to get pressure, this could be determined by standing on the platform of the brake staff. I exerted all my strength on the brake staff on car 678, and got no pressure. I discovered these conditions in a very short time after I got on the car. I discovered that both of them were apt to run away."

On the same subject the witness John F. Allen, testifying for the plaintiffs, and referring to the broken dog on the brake staff, said: "When Short called my attention to it I looked at it, and as soon as I looked I saw that it was broken off."

The witness Bonney, also one of the plaintiffs' witnesses, and who testified substantially the same as the witness Short respecting the defects in the braking apparatus of the two cars, and how readily a slight inspection revealed the defects, in the course of his testimony said: "When I went up on Saturday to inspect the cars I tried to apply the brake on car 678 and could not do it. I noticed this immediately—very soon—just as soon as I took hold of the brake wheel and turned it. This I determined very easily and quickly—within half a minute; for, from what little braking I had done, I knew that the brake was not in proper condition to let a car down on a steep grade. I am just testifying to the conditions as I found them. Before I got down I knew there was something the matter with the brake; that there was something wrong with the braking ap-

paratus on the car. It took practically no time to find this out. I got up and tried the brake on 631, and immediately discovered that the dog was broken. It took a very short time to discover this. The broken dog was in plain view—easy to be seen. So far as holding these cars on a heavy grade is concerned, these cars might just as well have been stripped of their.entire braking apparatus. That is my opinion."

There is also evidence to the effect that the cars, where they stood beyond the ore chute, would not start of themselves by gravitation after the brakes were off, so as to afford no opportunity for an inspection of the braking apparatus before starting. Upon this subject the witness Hickman, testifying for the plaintiffs, said: "I remember May 4, 1901, when Mr. Smith was killed. I saw him that day before he was killed. He was getting ready to lower a car with ore at the orehouse. I assisted him. It was about four o'clock. The car was being loaded at the orehouse. While performing that labor I observed some cars standing on the same track west of the orehouse—I should judge about one hundred feet west. As near as I can remember the cars were standing in the usual place. The cars that he got hurt on were standing in the usual place as the cars which were put in there on other days. The track at that point is practically level. I know he had a pinch bar for the purpose of moving those cars. I believe the mining company that employed him furnished him with the bar, which was used for that purpose—pinching cars so as to set them in motion. I say that it requires a pinch bar to start a car out of there when the brake is off; that is, to start the car east. After a car started it would run. It would run on to such a force that he would have to put on the brakes in order to hold the car when he got to the scales, which were right at the orehouse."

On this same subject, Mrs. Loulia B. Smith, plaintiff, testified: "Before Mr. Smith was killed . ʼ . I used to go up there frequently, and have seen him engaged in performing that work. He used to take a long

crow bar, and put it under the wheel, and get the car
in motion, and then he would get up quickly on the car
and take hold of the brake; that is the way he ordinarily,
did it.''

The defendant railway company introduced evi-
dence tending to show that the braking apparatus was
in proper condition, and in support of its affirmative
plea of contributory negligence, testimony respecting
rules and instructions of the mining company, the em-
ployer of the deceased, for his guidance in his employ-
ment.    On this subject of rules and instructions the wit-
ness Hope, who immediately preceded the deceased in
the employment, testified: ''When I quit that job on
November 12, 1900, Mr. Smith succeeded me, and he
commenced work at that time.    I worked with him the
first day that he worked there, and instructed him in
his duties, pursuant to instructions I received from the
Centennial Eureka Mining Company.    I showed him
the way to load cars and handle them.    I instructed him
never to load a car until he inspected the brakes to see
whether the chain was all right and the dogs were on
the car.    I told him to do this for his own safety.    I
told him to be very careful with the handling of the
cars, and take proper precautions to use track blocks, or
stop blocks, as we termed them, which are pieces of tim-
ber made of Oregon lumber, probably three feet in
length, and probably three or four inches in thickness.
There were such blocks there for that purpose.    I first
showed him how to drop the cars.    I went up and let
the cars down to the scales, using the block on this occa-
sion in order to show him, and put it on the track across
both rails, it being long enough to do this, on the scales
opposite the chute, where I wanted to stop the car.
After putting it there, I let the car down against it, and
told him always to follow that routine of work.    I told
him never to let down more than one car at a time.    I
told him never to let the cars away from the chutes until
the chutes were raised so that he could pull the chutes
out.    I talked with him during this day right along con-

cerning his duty.  I told him that every car we loaded that day was typical of how he should perform his work. I don't know how many cars we took down and loaded on that day.  We loaded as a rule anywhere from one to eight or nine cars—probably on an average of four or five cars a day.  I was with him all the time that day. I let the cars down in the first place, and he stood on the ground watching me.  After I had thus instructed him verbally, I reduced these various instructions to writing at his request.  He asked me to write out the company's rules, so as to help him do the work, in the event that he should overlook anything.  I tacked these instructions up in the scalehouse—the house that the scale bar is inclosed in.  He saw me tack them up."

The testimony of the superintendent of the mine, the witness Brown, in part, on this subject is:  "When I employed him I gave him instructions concerning his duties.  I told him to see that all the brakes on the cars were set, to examine them, and see if there were any defective parts, and, if so, to report to the mine office; to use his brake club and brake blocks, and move but one car at a time, I told him to examine them when they were put on the side track by the railroad company.  I didn't specially mention the brakes, but I told him to examine the cars, and see if there were any defective parts.  I instructed Mr. Hope, the gentleman who testified this afternoon, to go and assist him, and instruct him in his work."

The witness C. E. Allen, the general superintendent of the mining company, testified:  "I saw him at work probably within a week from the time he began.  About a week after, when I first saw him at work, the first thing I asked him was if he had plenty of brake blocks, and told him not to neglect using them, both at the scales where they loaded the ore and also at the place above where the last empty stood; that there were plenty of brake blocks at the mine, and at any time that he got short he should send for more, and never be out of them. . . .  I admonished him about keeping the scales

clean, and called his attention to the fact that he should never let but one car down the grade at a time, and that he should always see that the brakes were kept on the empties above it, and before letting cars down that he should examine them, and see if they were in good condition to be handled and ready to come down the grade. I told him that he should inspect the brakes and the braking apparatus in order to see that he could control his cars when he came down the grade.''

The testimony of the witness Barnard is of the same character and import, and none of this evidence appears to be contradicted. It is not shown by the evidence that the deceased used brake blocks in his attempt to handle the two cars at the time of the accident.

At the close of the plaintiffs' testimony a motion for a nonsuit on the part of the mining company was sustained by the court, and one overruled as to the railway company, and thereupon, after the evidence of the railway company had been introduced, the case was submitted to the jury, who returned a verdict in favor of the plaintiffs. This appeal is from the judgment.

BARTCH, J., after a statement of the case as above, delivered the opinion of the court.

At the conclusion of the evidence in this case the defendant railway company requested the court to instruct the jury to return a verdict in its favor. The refusal of this request, among other things, has been assigned as error.

The appellant railway company contends that the jury ought to have been so instructed, for the reason, as is insisted, that the uncontradicted evidence shows the deceased was guilty of contributory negligence which was the proximate cause of his injury and death. It is argued that the deceased was negligent in failing to observe and in deliberately violating the rules and instructions provided and given by his employer for his guidance and safety in the performance of his work.

The contention of the respondents on this point ap-

pears to be that the relation of master and servant did
not exist at the time of the accident between the appel-
lant railway company and the deceased, and that, there-
fore, if the railway company was negligent in furnish-
ing cars with defective braking apparatus, and the death
resulted from handling such cars, the railway company
can not, for the purpose of avoiding liability for its neg-
ligence, avail itself of a violation of the rules of the min-
ing company.   Such, at least, seems to be the result of
the contention of the respondents.

That the braking appliances of the two cars in ques-
tion were greatly defective is manifest from the evi-
dence of the plaintiffs, as shown in the statement of the
case, and, while this is contradicted by evidence of the
defendants, the jury must have found that the appli-
ances were defective, and that the railway company was
negligent in placing such cars upon the side track, and
such finding, based, as it is, upon conflicting evidence,
is conclusive on us upon such question.   Whether the
allegations of the complaint, as well as the evidence in-
troduced by the plaintiffs, show such obvious defects
in the braking appliances that the deceased ought to
have observed them, and have refrained from attempt-
ing to handle the cars on the steep grade, and that his
failure to do so rendered him guilty of contributory neg-
ligence fatal to a recovery for his death, is a question
unnecessary to decide.   It may be said, however, that
the complaint itself shows that a mere cursory exam-
ination would doubtless have revealed the dangerous
condition of the braking appliances.   Was, then, the de-
ceased himself so negligent, under the circumstances, as
to preclude his heirs from recovering as against his em-
ployer?

Under agreement with his employer, the railway
company placed the cars which he was to operate upon
the side track.   When so placed they were under his ex-
clusive charge.   It seems he was both conductor and
brakeman respecting the movements of those cars. That
his employment was more or less hazardous was appar-

ent from the character of the grade and the nature of the labor to be performed. All this was obvious, and must have been known by the deceased. Upon engaging to perform the work, he assumed the risks ordinarily incident to the employment. Having entered into such a service, it was his undoubted duty, aside from any specific instructions, not only for his own safety, but also for the protection of the property of his employer, before attempting to run the cars down to the ore chute to inspect the appliances with which he expected to handle and stop them. Had he done this, it seems clear that he might have avoided the accident; for, if the defects existed, they were, according to the plaintiffs' evidence, open, obvious, and discoverable upon slight inspection. Notwithstanding his plain duty, however, to inspect the cars and their appliances, even without special instructions to do so, his employer did give the deceased, upon entering the service, special instructions, and adopted rules for his guidance and safety, which were to the effect that the employee should never attempt to run down on the side track more than one car at a time; that before letting a car down he should always examine it, and see that it was in condition to be handled, and that the brakes were kept set on the empties above it; that before loading a car he should inspect the brakes and appliances, and see if there were any defective parts, and, if there were, to report to the mine office; and that he should take care to use track blocks across the track where the last empty car stood, and also at the orehouse to stop the car to be loaded. These instructions were promulgated for the employee's own safety as well as for the protection of the property of his employer, and the law is well settled that an employer, engaged in a hazardous business, has the right, and that it is his duty, to formulate reasonable rules to enhance its orderly and safe conduct, so as to secure protection to property and the public, and to reduce the risks assumed by the employees.

In this case the employer not only promulgated

reasonable and proper rules, but, upon the employee entering into the service, imparted to him special instructions for the safe management and performance of the business. The rules and instructions, made and given for the employee's special benefit and safety, were by him, on the occasion of the accident, as appears from the plaintiffs' own testimony, wholly disregarded; for that testimony, which is binding upon the respondents, whatever, under the circumstances, the real fact may be, discloses, not only that, in violation of the positive instructions of the master, the deceased ran two cars coupled together down the grade instead of one, as instructed, but also that the braking appliances were so grossly defective as to be practically useless, a condition which required but slight inspection to reveal, and that no inspection could possibly have been made before the moving of the cars and the defects remain undiscovered. Nor was any report, so far as shown in evidence, made to the mine office. Thus, the evidence shows such a palpable disregard by the employee of the rules and instructions of the employer as clearly absolves the employer, the mining company, from all liability to the plaintiffs for the unfortunate consequences of the disobedience of the employee; the proof clearly showing that the want of the employee's observance of the rules and instructions were the proximate cause of the resultant injuries and death.

It is plainly indicated by the evidence that the deceased made no effort to discover an open peril. There is nothing to show that he even made use of any brake blocks, while it is manifest that, in total disregard of his employer's rule, he attempted to move two cars down the steep grade, with a braking apparatus wholly insufficient to hold one, and the insufficiency of which could have been ascertained upon slight inspection, in accordance with his instructions. The conclusion, from the evidence, is irresistible that the lamentable misfortune was the result of his own heedlessness, being directly attributable to his disobedience of the rules and

instructions of his employer at a time when, so far as appears from the record, there was the existence of no emergency which required hasty action. This is so patent from the proof as to leave no room for reasonable minds to differ in relation thereto. Such disobedience, under the circumstances, rendered him guilty, in law, of contributory negligence, and such negligence, without doubt, was the proximate cause of his death. Clearly, therefore, no action is maintainable by the heirs against his employer, the mining company. The rules and instructions were proper and reasonable, and it was the duty of the deceased, under the law, to obey them, and, having failed to do so, his employer was released from liability for the injuries which were the direct result of such failure.

"It is," says Mr. Beach, "contributory negligence of an aggravated character on the part of an employee to disobey reasonable rules and regulations enacted to protect him from injury. If he is injured through such a gross and unwarranted disregard of his own safety, his remedy is gone. Such negligence is the most pronounced contributory negligence possible. It properly leaves the person injured by it wholly remediless." Beach, Contr. Neg., section 373.

In Scott v. Eastern Ry. Co. (Minn.), 95 N. W. 892, the Supreme Court of Minnesota, speaking through Mr. Justice Collins, said: "The universally established doctrine is that if an employee, of ordinary intelligence, is injured by reason of his disobedience or disregard of reasonable rules and orders issued by the master, and brought to his attention in ample time, and opportunity being given in which to obey, he cannot recover, as against the master, for an injury received, when a violation of a rule is the proximate cause of his injury. He will, as a matter of law, be deemed guilty of contributory negligence."

The same court, in Nordquist v. Great Northern Ry. Co. (Minn.), 95 N. W. 322, said: "An employee is

27 Utah 21

bound to obey all of the reasonable rules of his employer with reference to the conduct of his business. Disobedience of such rules, if it contributes directly to the injury of the employee, conclusively charges him with negligence, which will bar any recovery of damages for his injury.''

In Karrer v. D. G. H. & M. R. R. Co., 76 Mich. 400, 43 N. W. 370, where the employees were acting under printed orders relating to their safety, which the plaintiff failed to obey, the court said: ''It was the plaintiff's duty to examine into the coupling arrangements of both cars before he attempted to couple them, and, as they were only a rod apart at most before he started the train back, and as he says the defect was visible at once to any one looking, one or two seconds would have furnished all the time needed to satisfy himself, had he been acting under any one else's orders and not for himself; but as he had personal direction of the engineer's movements, and could move when he pleased, the case, as he presents it, was an aggravated one of the grossest carelessness, for which he, and no one else, was responsible.''

So, in La Croy v. N. Y., L. E. & W. Ry. Co., 132 N. Y. 570, 30 N. E. 391, the plaintiff, who had been injured, was employed as a brakeman on defendant's freight train. One of the printed rules required brakemen, before starting, to test the hand brakes. This was not done on the occasion of the accident which caused the injury for which recovery was sought. The court, holding that disobedience of the rules caused the accident, and that, therefore, the plaintiff was not entitled to recover, said: ''In the absence of printed instructions, the plaintiff and the rest of the train crew well knew that their duty to their employer, and a proper regard for their own personal safety, made it incumbent upon them to know, before reaching the point where the steep descent began, which continued for nearly six miles, whether the train contained the requisite number of brakes to properly check its speed, and

as a necessary consequence the plaintiff can not require the defendant to make good to him the damages resulting from an injury which could not have been sustained had he and his coemployees observed that reasonable care and caution which their experience suggested and the situation demanded.''

In Darracott v. C. & O. R. R. Co., 83 Va. 288, 2 S. E. 511, 5 Am. St. Rep. 266, where the injury complained of was a result of a disregard of rules, it was said: ''At all events, the evidence shows that the dangerous condition of the coupling was obvious, and that the plaintiff, in violation of the rules of the company, voluntarily put himself in a position of danger, in consequence of which he was injured. Under these circumstances in the eye of the law, he was the author of his own misfortune; that is to say, his negligence, or, what is the same thing, his want of ordinary care and caution, was the proximate cause of the injury complained of. The action is therefore not maintainable.'' C. & A. R. R. Co. v. Bragonier, 119 Ill. 51; 7 N. E. 688; Bennett v. Northern Pac. R. R. Co., 2 N. D. 112, 49 N. W. 408, 13 L. R. A. 465; Higgins v. Southern Pac., 26 Utah 164, 72 Pac. 690; Butte v. Pleasant Valley Coal Co., 14 Utah 282, 47 Pac. 77; Burgess v. R. R. Co., 17 Utah 406; Ill. Cent. R. R. v. Jewell, Adm'x, 46 Ill. 99, 92 Am. Dec. 240.

The heirs of the deceased, being thus precluded from a recovery against the employer because of the contributory negligence of the deceased, have they a right of recovery against the railway company who furnished the cars? It seems, as to this question the respondents assume the position that the railway company can not rely upon the contributory negligence of the deceased, because at the time of the accident he was not in its employ, and its rules were not violated. They claim that when the deceased entered the services of the mining company, and received its instructions, a contract relation was created between them, and that

the railway company, being no party to the contract, can take no advantage of its breach by the deceased.

The answer to this is that this action is one sounding in tort against the railway company, and not upon contract, to recover for the death of the deceased, and that the proof shows such death was caused by the deceased's own wrong, no act of gross or wanton negligence on the part of the railway company being charged. Such being the case, the tortious acts or negligence of the railway company, if it was guilty of any, can not be made the basis of a recovery for injuries resulting from the wrong or negligence of the deceased. Clearly, if the unfortunate occurrence had resulted but in injuries, and not in death, and the deceased had brought an action against the railway company to recover damages for negligence, proof that his own negligence, and not that of the company, caused his injuries, would have been a complete defense, and where, as in this case, the recovery is sought for the death, the heirs are in no better situation than the deceased himself would be if living. Wherever contributory negligence is established as the proximate cause of an injury it is always a complete defense, and bars a recovery for such injury. In such case, the maxim, *"Volenti non fit injuria,"* applies.

The existence of contract relations is not essential to an invoking of the rule as to contributory negligence. The right to the application of that rule is founded upon the principle that no person can be permitted to make his own wrong, or his own voluntary act, whether tortious or not, the basis for a recovery against another. Where an injury results to a person because of his own wrongful act or violation of duty, neither he nor his heirs can recover damages from another for such injury. In such a case no action is maintainable. One who, through want of ordinary care, inflicts a wound upon his own body, must be content to bear the suffering and the loss, and neither he, nor, in the event of death, his heirs, have any redress. "Contributory negligence, in its judicial sense, is usually the personal de-

fault of the plaintiff himself.   The general rule is that when the plaintiff's own want of ordinary care is a proximate cause of the injury he sustains he cannot recover damages from another therefor.''   Beach, Contr. Neg, section 100.

Mr. Thompson, in his Commentaries on the Law of Negligence, vol. 1, sec. 185, says: ''Where a person, by his own deliberate act, brings an injury upon himself, he can not make it the ground of recovering damages against another, where he is not impelled thereto by some imminent danger, or by some exciting or exasperating circumstances, for which that other is responsible.   The principle that a person can not make his own wrong or his voluntary act, whether wrongful or not, the ground of recovering damages from another, has found an expression in the maxim, ''*Volenti non fit injuria.*' ''

In Railroad Co. v. Aspell, 23 Pa. St. 147, 62 Am. Dec. 323, Mr. Chief Justice Black said: ''It has been a rule of law from time immemorial, and is not likely to be changed in all time to come, that there can be no recovery for an injury caused by the mutual default of both parties.   When it can be shown that it would not have happened except for the culpable negligence of the party injured, concurring with that of the other party, no action can be maintained.''   1 Thomp. Comm. Neg. section 186; Wharton, Neg. section 73; 2 Jaggard on Torts, 960; Ray, Neg. Imp. Dut. Pass. 669, 670; Texas & P. Ry. Co. v. Moore (Tex. Civ. App.) 27 S. W. 962; New York, C. & St. L. R. Co. v. Perriguey, 138 Ind. 414, 34 N. E. 233, 37 N. E. 976; Lewis v. Flint & P. M. Ry. Co., 54 Mich. 55, 19 N. W. 744, 52 Am. Rep. 790; Langridge v. Levy, 2 M. & W. 519; Carter v. Towne, 98 Mass. 567, 96 Am. Dec. 682; Crain v. Petrie, 6 Hill 522, 41 Am. Dec. 765.

Viewing the pleadings and the evidence contained in the record thus in the light of the law applicable to this case, we are of the opinion that the plaintiffs have shown no right to recover damages against the railway

company, that the contributory negligence of the deceased is available to that company as a defense to this action, and that the court erred in refusing to instruct the jury to return a verdict as requested by the defense. This disposes of the case, and it is therefore of no importance to pass upon the other questions presented.

The judgment must be reversed, with costs, and a new trial granted. It is so ordered.

BASKIN, C. J., concurs.

McCARTY, J., concurs in the order of reversal, but dissents from the grounds stated and the reasons given therefor in the majority opinion.

There are three reasons given in the foregoing opinion why this case should be reversed. The first is that the facts, over which there is no substantial conflict in the evidence, considered in its entirety, show that the alleged defective condition of the braking apparatus of the two cars which John P. Smith, the deceased, was moving at the time he was killed, was so open, plain, and obvious that he, by the exercise of ordinary care and diligence, could have discovered it before he started to move the cars, and therefore he was guilty of contributory negligence; second, that his failure to observe and follow, on that occasion, the instructions given him by his superiors not to move more than one car at a time, also constituted contributory negligence on his part; and, third, that the court erred in refusing, after the evidence was all in, to peremptorily instruct the jury to return a verdict in favor of defendant railway company.

I am unable to agree with my brethren not only as to the facts in the case, but as to the law applicable to the facts. The record shows that the two empty cars, at the time John P. Smith started to move or run them down to the ore chute, were standing on a descending grade, with the brakes sufficiently set to hold them in place on the track without pulling on their couplings or the couplings of the cars standing above them and to

which they were attached.    The great preponderance of the evidence shows that the moment a car standing on the track, at the point where these cars were taken from by the deceased on the day of the fatal accident, is uncoupled from the one above it, and the brakes loosened or thrown off, it would start of its own accord.    T. D. Fenton, the conductor under whose directions the cars in question were left on the switch track at the point from where they were moved by the deceased, just before his death, was called by the appellant, and testified on this point as follows:    ''The surface of the track which leads along these orehouses is on an incline to the east. . . .  We put the cars on to this side track from the west end. . . .  This was done on May 4, 1901, the day of the accident to Mr. Smith. . . . . We pushed twelve empty cars on to the side track that day. .- . .  The grade was such that it became necessary to apply the brakes to keep the cars from running down. . . .  The brakes are first applied on the east end, towards the ore chute.  This is done so as to keep the slack against the other cars, in order  . . .  to enable the Centennial Eureka Mining Company's men to uncouple the car.  The hand brake was applied and set first on the first car, and then in regular order till the last car was reached, from the east to the west, up the incline—up towards the switch.  When the brakes are all set, each car on the incline was held by the hand-brake power.  It was not held at all on the incline by the couplings to the adjoining cars. . . .  If the brakes were off the lower car, and the car was pulling on the coupling, you could not uncouple it.  If the brakes were off the two lower cars, and a string of cars were standing on that incline, you could not uncouple these two cars from the remainder.  I know of my own knowledge that when I left those cars that morning (May 4, 1901) . . .  on this side track above the Centennial Eureka orehouse that the brakes were on and the pressure applied on every one of those cars.''

J. A. Houtz, a brakeman under Fenton, testified,

that the brakes were set on the lower or first end, and then on the other cars higher up in succession; that "the brakes were so set in order that Smith would have no trouble in getting the various cars off, for, if the slack was allowed to run out, it would be impossible for him to get the cars off, because the weight of the cars would be drawn against the draw rod, thereby preventing the raising of the lock. . . . As the cars were upon the side track, and the brakes set in the manner I have described, our custom was that each individual car should be held in place by its own brakes. If a brake on any particular car would not hold it, the result would be that the minute you move the car in front away it—the car with no brake—would pull down on the remaining cars, and you could not cut it off from them. . . . It was necessary on such a grade as that to apply the brakes in order to stop and hold the car."

William Freckleton, a witness for the plaintiffs testified that a car would not stand on this incline "unless it was braked or blocked." The record also shows that two days after the accident the two cars mentioned were taken by appellant and replaced on the track above the ore chute on the same grade and in the vicinity of where they were standing when the deceased started to move them at the time he was killed.

L. D. Dickenson testified that one Herbert Hayes let these two cars down over the same track by the hand brakes. "He let down only one car at a time. He let down the head one first. . . . He released the brake, and the car started. . . . Stopped it once on the way down. . . . Then he went back and got the other car, and went through the same performance . . . When we went back to start the hind car we released the brake, and it started immediately."

Herbert Hope, another of the appellant's witnesses testified, in part, as follows: "I got up on the car lower down on the grade—my impression is that it was 678— and kicked the brake off. . . . I let the brake off and the car started, and I let it down the grade. I

then went back to the lower car. When I got to it—car 631—I got up and released the brake. . . . The car started immediately when the brakes were let off."

Appellant concedes that cars standing on this incline, when uncoupled and the brakes thrown off, would start without any propelling force except that furnished by their own weight. Counsel for appellant in their brief say: "It is apparent from the great weight of the evidence that the cars would set themselves in motion if the brakes were released and if they were uncoupled."

There is a sharp conflict in the evidence respecting the condition and general appearance of these two cars immediately after the accident. Upon one point there is but little, if any, conflict in the testimony, and that is the alleged defective condition of the braking apparatus was discovered by the parties making the examination either by getting upon the cars and testing the brakes by applying and setting them, or by having the defects pointed out to them by parties who had made the tests. Regarding the general appearance of the cars, B. L. Short testified, in part as follows: "I got upon car No. 678, and tried to set the brake. The shoes would make no effect upon the brake wheel, and I got no pressure. I got down, and the shoes . . . on that car were in their places. I noticed their thickness, and they were apparently in pretty good shape. So far as the shoes were concerned, they looked all right."

William Freckleton, another witness for plaintiffs, testified, as follows: "The mere fact that the shoes on 631 were worn thin is no defect so long as they took effect;" and again, "I didn't notice what caused the brake to get out on one side, and the brake shoe to pass on the flange of the wheel. All the other brake shoes except this one were in their proper place on car 631. All were good shoes, not broken—good for the purpose of pressure. The only thing wrong with the car on Saturday night (the day of the accident) was the brake shoe pressing on the flange. With that exception the brak-

ing apparatus on that car was in good condition, so far as I know." He also testified that the brake shoes on car 678 were in fair condition.

The witness Bonney, in giving his testimony, said: "I examined the brake shoes upon car 678. They were all in very good condition except this one, that was in the brakehead, and it was in fair condition. It had been worn."

A. J. Bauer, a witness for defendant, testified that he examined the brakes on these two cars, and that "they were in good condition;" that "they worked first class."

T. D. Fenton, the conductor, testified that he made a very thorough test and examination of the braking apparatus on these two cars, and "found that it worked all right." Again he says: "I inspected the entire braking apparatus on each car, and found that its condition was good." Several other witnesses for the appellant testified that they examined and tested the brakes on these cars, and found them to be in good condition.

Now, it must be borne in mind that John P. Smith, the deceased, had no such opportunity for examining and testing these brakes as the witnesses in the case. When the tests were made by the witnesses the cars were standing on comparatively level track, and it was not necessary to apply the brakes in order to hold the cars in place while the tests were being made.

The foregoing testimony tends to show that the alleged defective condition of the brakes was not really discernible without making a physical test by applying or setting them. And there also is evidence that this could not be done while the cars were standing on the incline above the ore chute, for the reason that they would start to run down the grade the moment the brakes were loosened and thrown off and the cars uncoupled. This evidence, considered in connection with the fact that the brakes were set and applied on these cars at the time the deceased uncoupled them from the car standing imme-

diately above, which fact was at least an indication that
the brakes were not disabled, creates too much uncer-
tainty as to whether or not deceased knew, or in the ex-
ercise of ordinary care and diligence could have known
of the alleged defects before he started to move the cars,
for this or any other court to say, as a matter of law,
that he was guilty of contributory negligence because he
moved these cars in their alleged disabled condition
down the track on the occasion referred to.

Appellant contends, and this court in the opinion
written by Mr. Justice BARTCH in the case holds, that
the deceased was guilty of contributory negligence in
moving two cars at a time down the incline in violation
of the instructions given him by those under whom he
was working, which the railway company can success-
fully plead as a defense in this case.

The evidence, as I view it, is far from conclusive
that the act of moving the two cars at the same time,
on the occasion referred to, was in and of itself negli-
gence per se.   In fact there is evidence in the record
that tends to show that it was not negligence.   When the
employees of the railway company removed the two
cars in question from where Smith was killed, they took
them, coupled together, back up the main line, where
they were "kicked" onto the switch by the engine, and
set going down the incline above the ore chute at the rate
of eight miles per hour, and were controlled and stopped
by one man on the steepest part of the grade by the ap-
plication of the brakes on the head car only, and a lit-
tle later they were taken down, one at a time, to the ore
chute, loaded with ore, and then let down the track be-
low the ore house by means of the hand brake.   From
the orehouse down the grade is almost twice as great as
it is above.   And, further, some five or six of appel-
lant's employees, men of experience in this kind of
work, testified in the case, and not one of them so much
as intimated that it was extra hazardous to let two empty
cars down the incline above the ore chute at the same

time, but, on the contrary, three of them showed by actual demonstration that it was not.

I know of no rule or principle of law that would permit the appellant, by virtue of instructions given the deceased by the mining company respecting his duties in the handling of the cars, to which the railway company was in no way privy, to shift upon him the legal duty it was under to inspect and use ordinary care to see that its cars were in reasonably good condition before placing them upon the switch track to be loaded with ore. The deceased in the handling of these cars owed the railway company no greater duty than his master, the Centennial Eureka Mining Company, did, and it must be conceded that the only duty the mining company owed was to exercise that same degree of care and caution as is usually observed by men of ordinary prudence engaged in this kind of work, and this is all that appellant could legally exact from the deceased, notwithstanding the mining company may have, through a superabundance of caution, instructed its employees to exercise extraordinary care in the handling of these cars. Suppose, for example, the superintendent of the mining company had given the deceased positive instructions never to take a loaded car down the incline below the orehouse without first making a personal inspection of the track, and through some inadvertence or oversight on the part of Smith he had omitted to make the inspection, and had taken a car down loaded with valuable ore, and ran into an open switch, which the employees of the railway company had failed to close, or into an obstruction which they had left upon the track, under circumstances showing negligence on the part of the railway company, and ditched the car, and a portion of the ore was lost and Smith severely injured thereby, would it be seriously contended that because Smith had failed to perform a duty that devolved upon the railway company that it could successfully interpose and plead as a defense, in a suit by the mining company for

the loss of its ore, that Smith had failed to observe the instructions given by his master, and perform a duty that legally devolved upon the railway company? I think not, because there can be no question but what the mining company, under these circumstances, could recover. Yet, if the doctrine announced in the prevailing opinion is the law, Smith could not recover for his injuries resulting from the ditching of the car. In other words, Smith owed the railway company, with which he had no contractual relations whatever, a greater duty than did his master, between whom and the railway company such relations existed; which, I respectfully insist, is contrary to all precedent. The two companies occupied the relative legal positions that usually exist between shippers and common carriers and nothing more. As the relation of master and servant did not exist in the remotest degree between the railway company and the deceased, all that this company could legally exact of him, while he was engaged in the handling of its cars was that he exercise ordinary care for his own safety, and this he was bound to do before he could complain of the negligence of the company.

There are only two questions involved in appellant's plea of contributory negligence, and they were questions of fact for the jury. The first is, were the defects in the braking apparatus of these two cars so open, plain, and obvious that the deceased, by the exercise of ordinary care, would have discovered them, and did he in moving the cars exercise that degree of care and caution that men of prudence, skilled in that kind of work, usually observe when engaged in its performance? And, second, were the risks and hazards incident to, and which naturally arose from, the taking of two empty cars, coupled together, down the incline above the ore chute by one man experienced in the work, so great that a man of ordinary prudence, understanding and appreciating such hazards and dangers, would not attempt its performance?

The trial court gave the following instructions, wherein the law applicable to the facts is correctly stated:

"You are further instructed that in respect to the instructions which it is claimed on behalf of the defendant railway company were given to the deceased, John P. Smith, at the time he entered upon his employment, that if you believe from the evidence such instructions were given, the mere violation of or neglect to observe such instructions was not contributory negligence on the part of said John P. Smith; but if you believe from the evidence that at the time in question said John P. Smith violated or neglected to observe any of these instructions, and further believe from the evidence that in the violation or neglect of the same he was, under the circumstances of the case, guilty of a failure to exercise reasonable care for his own safety, and that except for such failure on his part the accident in question would not have happened, then he was guilty of contributory negligence, and the plaintiffs in this action cannot recover.

"You are further instructed that it was the duty of the deceased to inform himself of the dangers peculiar to the work in which he was engaged, and it was his duty to go about his work with his eyes open. It was his duty to use ordinary care to learn the dangers which were liable to beset him in his employment. If, therefore, you believe from the evidence that the injuries to and death of the deceased resulted from being exposed to dangers which were known to him, or which could have been known to him by the exercise of ordinary care on his part, then the plaintiffs can not recover in this action."

The authorities cited in the opinion written by Mr. Justice BARTCH are cases wherein the rules of law relating to master and servant governed, but which I contend can have no application in this case, as the deceased and the appellant stood in the same relation to each other as the servant of the shipper does to the com-

mon carrier, which is entirely distinct from that of master and servant.

Few cases arise wherein there is a sharper and more substantial conflict on all of the material issues than is shown to exist in this action; therefore it would have been an unwarranted invasion of the province of the jury for the court to have given the peremptory instructions asked for by appellant.

The court gave the jury the following instruction: "The cars were operated to and from a point immediately underneath the chute from the orehouse by the power of gravitation, and the evidence shows that the method employed by Smith was to 'pinch' the cars with a crowbar in order to set them in motion, and that he would bring them to a stop by the use of the hand brakes." Appellant excepted to this instruction, and now assigns the giving of it as error. By an examination of the record it will be seen that there is a sharp conflict in the evidence as to whether the cars were set in motion by the use of a pinch bar or started of their own accord by the power of gravitation. Therefore the giving of the instruction was error.

I am of the opinion that the case should be reversed, with costs, with instructions to the trial court to grant a new trial, and permit the parties to amend their pleadings should they so desire. I concur in the reversal.