154 So. 775

## CITY ICE DELIVERY CO. v. GOODE.

### 6 Div. 337.

Supreme Court of Alabama.

April 19, 1934.

Rehearing Denied May 31, 1934.

London, Yancey & Brower, of Birmingham, for appellant.

649

Harsh, Harsh & Hare, of Birmingham, for appellee.

PER CURIAM.

This is an action on the case under the homicide act (section 5696, Code) by the personal representative of M. C. Goode, deceased, against the appellant for wrongfully causing the death of said Goode.

Count 1 of the complaint, as last amended, avers that, "while plaintiff's intestate was by invitation or request of defendant," on defendant's mule lot, "a mule of which, on said occasion, defendant was in charge or control, kicked or struck plaintiff's intestate and as a proximate consequence thereof plaintiff died." Plaintiff further avers "that on said occasion defendant negligently caused or allowed said animal, towit, a mule, to kick or strike plaintiff's intestate, and as a prox-

imate consequence of defendant's said negligence, plaintiff's intestate was so injured that he died."

The second count, after adopting the inducement averments of count 1, avers "that on said occasion a servant or agent of defendant acting within the line and scope of his authority as such servant or agent wantonly caused or wantonly allowed said animal, towit, a mule, to kick or strike plaintiff's intestate as aforesaid, and as a proximate consequence of said wanton conduct plaintiff's intestate was as aforesaid, so injured that he died."

These counts show that plaintiff's intestate was on defendant's premises as an invitee, and that he was injured as a proximate consequence of the negligence of the defendant, or the wanton conduct of its agent or servant while acting within the scope of his employment, and were not subject to any of the objections stated in the demurrers interposed thereto. Doullut & Williams v. Hoffman, 204 Ala. 33, 86 So. 73; Alabama Baptist Hospital Board v. Carter, 226 Ala. 109, 145 So. 443; Farmers' & Merchants' Warehouse Co. v. Perry, 218 Ala. 223, 118 So. 406.

▮▮▮ Count 4, as last amended, avers that, "while plaintiff's intestate was by invitation of defendant upon defendant's premises, towit, a mule lot * * * an animal, towit, a mule which, on said occasion, was owned or being kept by defendant, kicked or otherwise injured plaintiff's intestate, so that as a proximate consequence thereof, plaintiff's said intestate died. Plaintiff further avers that said mule was at said time a vicious or dangerous animal and that on said occasion *defendant negligently managed said mule* and as a proximate consequence of said negligence, and without fault upon the part of plaintiff's said intestate, plaintiff suffered said injury and damage." (Italics supplied.)

"When a complaint for personal injuries specifies particular acts or omissions of the defendant as constituting the negligence upon which the action is founded, the complaint is insufficient on apt demurrer, unless such acts in themselves show or suggest negligence, and a general averment of negligence does not cure the defective specification." Birmingham Ry. L. & P. Co. v. Barrett, 179 Ala. 274, 279, 60 So. 262, 263.

Managing the mule in the mule lot does not show or suggest negligence, certainly in the absence of knowledge on the part of defendant that the mule was a vicious animal, and the circumstances attending the management. Our judgment is that said count 4 was subject to the defects pointed out by grounds 8, 18, A, and I of the demurrer interposed thereto, and the court erred in overruling the same.

This error was not rendered innocuous by the proof. The evidence is without dispute that on the occasion of the injury of plaintiff's intestate the defendant did not manage the mule; the mule was under the management of the farrier, who, as an independent contractor, was shoeing the mule in pursuance of his contract with defendant. The only agent or servant of the defendant present was Ragsdale, who looked after feeding and attending to the mules in the lot, and, on the occasion in question, was under the direction of W. F. Goode, holding the rope or "tackle" attached to the mule's hind foot and arranged by said W. F. Goode so as to hold up the hind foot and prevent the mule from kicking. Said intestate, an employee of W. F. Goode, though he had no duty to perform in respect to this work, as a volunteer was holding the bridle of the mule. After shoeing one hind foot of the mule, the rope was attached to the other hind foot and arranged by said W. F. Goode, and was likewise being held by Ragsdale, with intestate holding the bridle, and W. F. Goode directed Ragsdale to hand to him the tool box, or shove it to him, and at this juncture the mule lunged and broke Ragsdale's hold on the rope, and, with intestate holding onto the bridle, scrambled to the center of the mule lot, and W. F. Goode directed intestate to turn the mule loose, and at this juncture the mule kicked intestate, inflicting upon him the injuries causing his death.

The only possible breach of obligation or duty imputable to the defendant, so far as the evidence shows, or tends to show, is that it failed to have present men capable of holding the mule while W. F. Goode, the farrier, put the shoes on him. And the statement of the proposition shows that this was not an obligation or duty running to plaintiff's intestate who had no duty to perform, and was not supposed to have any connection with this work; this obligation or duty ran to W. F. Goode, who was to do the work of shoeing the mule.

The facts as to the agreement between W. F. Goode, the farrier, and defendant, when the evidence is viewed in the most favorable light to plaintiff, are illustrated by Goode's testimony: "I say that Mr. Dorn (defendant's manager) told me that it was so far to take the mules to Woodlawn, and he suggested that if I could shoe them up there at the lot, something to that effect; I wouldn't say just the words that were said. I asked

him 'what about that gray mule? I can't shoe it by myself,' and he says, 'I will furnish you with plenty of help to shoe old Gray.' When I came there to shoe old Gray at this particular time Mr. Ragsdale was there. *We were a little late and the drivers were all gone.* There wasn't anybody else there to help me shoe old Gray except Mr. Ragsdale. As to whether Mr. Ragsdale got my father also to assist in it, I couldn't say. My father didn't take part in helping to shoe the mule, nothing more than he was holding the head of the mule, the bridle of the mule. * * * I couldn't say whether Mr. Ragsdale made any gesture to pass the tool box to me just before the mule bolted. I called for the box, but, you see, my back was to Mr. Ragsdale. I told him to hand me the box, and just about that time the mule made a lunge * * * and got away. * * * On this occasion Ragsdale turned loose or the mule jerked loose. He got loose some way. * * * Nobody connected with the City Ice Delivery Company sought to tell me or instruct me how to shoe any particular mule. I was just told what mules needed shoes and I shod them. In connection with the tackle, in putting it on this gray mule, I roped the mule up. I put the rope around his head and ran it back upon his leg and picked it up. I didn't have anybody else to do it. I didn't wait for this man Ragsdale or some negro helper to tell me how to rope that mule up, but I had to have help in doing it, but as to tying the ropes, I knew how to do that myself. * * * The man I made the arrangements with was not this man Ragsdale, it was a man by the name of Dorn. He was in the office the day this accident happened, but he was not there in the mule lot. Yes, sir, I said I got out there a little late, *and when I got there the negroes that they had usually to help me were gone.* Mr. Ragsdale went out to look for somebody and came back and said they were all gone, and then I went ahead to shoeing the mules. Mr. Ragsdale and I went to tying the mule up. I knew at the time I went to tying the mule up that there was nobody there to help me but Ragsdale." (Italics supplied.)

Ragsdale testified, inter alia: "I had been knowing Mr. Goode here for two or three years, and he had been coming around there and I had been helping him, and I didn't tell Mr. Goode how to shoe the mule; that wasn't my job. Mr. Goode was the blacksmith. I didn't attempt to show him how to tie the mule up; he knew. As a matter of fact, he told me what to do; he did all the tying up. He did the tying up and told *us* to hold. I

held that part that he told me. In other words, I gave Mr. Goode no instructions about how to handle those mules. He gave them to me. That is right. I didn't know. very much about being a blacksmith." (Italics supplied.)

If it be assumed that it was Ragsdale's duty, as an agent or servant of the defendant, to assemble the help from among the mule drivers to hold the mule while he was being shod by W. F. Goode, and he was unable to do so because Goode came to do the work after the helpers had gone for the day, this was not negligence on the part of Ragsdale.

However, if it be assumed that such failure was a breach of duty on the part of Ragsdale, as the agent or servant of the defendant, it was not a duty which the defendant owed the plaintiff's intestate, and therefore cannot be made the predicate for actionable negligence resulting in his injury and death. Hill v. Reaves, 224 Ala. 205, 139 So. 263; Tennessee Coal, Iron & R. Co. v. Smith, 171 Ala. 251, 55 So. 170.

The same is true if it be conceded that Ragsdale, in the absence of competent help, was guilty of negligence in undertaking, with the assistance of plaintiff's intestate, to hold the mule while being shod by W. F. Goode. This was a breach of duty, not to plaintiff's intestate, but to W. F. Goode, and this is so whether plaintiff's intestate was a volunteer or acted on the request of Ragsdale.

Moreover, the evidence is without dispute that plaintiff's intestate was an experienced blacksmith; knew of the vicious propensities of the mule and the necessity for competent help to hold him, and either voluntarily or at the request of W. F. Goode or Ragsdale, one or both, stepped into the breach, participating in the performance of the alleged damnifying act—negligently managing the mule—and hence contributed to his own hurt.

The principle that a person cannot make his own negligent act the ground of recovering damages from another has found expression in the maxim, "volenti non fit injuria." Smith v. Centennial Eureka Min. Co., 27 Utah, 307, 75 P. 749, 755, 756; Thompson on Negligence, vol. 1, § 185.

If the defendant on the occasion of the injury "negligently managed said mule," it managed it through and by Ragsdale and plaintiff's intestate, both of whom, as the undisputed evidence shows, participated in the

652

alleged negligent act, and, on principles above stated, the plaintiff was not entitled to recover. The court therefore erred in refusing the affirmative charge requested by the defendant.

Reversed and remanded.

ANDERSON, C. J., and THOMAS, BROWN, and KNIGHT, JJ., concur.